JUSTICE PATTERSON delivered the opinion of the Court.
**493 *648 The Legislative Review Clause authorizes the Legislature to determine whether an administrative rule or regulation promulgated by an executive agency "is consistent with the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement." N.J. Const. art. V, § 4, ¶ 6. The Clause prescribes a procedure through which the Legislature, by concurrent resolution, notifies the Governor and executive agency that the challenged rule or regulation contravenes legislative intent as stated in an enabling act's statutory terms, and gives the agency an opportunity to amend or withdraw the rule or regulation. In a second concurrent resolution, the Legislature invalidates the rule or regulation. Ibid.
In the five appeals before the Court, we consider the Legislature's first exercise of its constitutional authority under the Legislative Review Clause. The appeals arose from the Civil Service Commission's (the Commission) introduction of a rule allowing "job banding," the aggregation of certain public employment job titles in a "band" that permits employees to advance to higher titles within a band without competitive examinations. N.J.A.C. 4A:3-3.2A. The Legislature contended that the Commission's job banding rule contravened Article VII, Section 1, Paragraph 2 of the New Jersey Constitution, a provision addressing competitive examinations in public employment, and the New Jersey Civil Service Act, N.J.S.A. 11A:1-1 to 12.6. It first objected to, and then invalidated, the rule by concurrent resolution. Asserting that its job banding rule was consonant with the New Jersey Constitution and the Civil Service Act, the Commission nevertheless adopted and implemented that rule.
The Commission's actions were challenged in appeals filed by Stephen M. Sweeney, President of the Senate; Vincent Prieto, Speaker of the General Assembly; the Senate; the General Assembly; and two unions representing public employees affected by the job banding rule. A threshold question arose as to whether and under what standard a court can review concurrent resolutions as **494 to agency rules and regulations. An Appellate Division panel held that a court may reverse the Legislature's invalidation of a rule or regulation if the Legislature's action is procedurally deficient, if it violates federal or state constitutional *649 protections, or if it constitutes a patently erroneous interpretation of the statutory language of the enabling act. Commc'ns Workers of Am. v. Civil Serv. Comm'n, 447 N.J. Super. 584, 601, 149 A.3d 844 (App. Div. 2016). Under that standard, the panel found no defect in the Legislature's invalidation of the job banding rule. The panel therefore reversed the Commission's decisions, and invalidated N.J.A.C. 4A:3-3.2A. Id. at 606, 149 A.3d 844.
We now modify the standard of review articulated by the Appellate Division panel to harmonize the Legislative Review Clause with our Constitution's separation of powers provision, N.J. Const. art. III, ¶ 1, and Presentment Clause, N.J. Const. art. V, § 1, ¶ 14. We hold that a court may reverse the Legislature's invalidation of an agency rule or regulation pursuant to the Legislative Review Clause if (1) the Legislature has not complied with the procedural requirements of the Clause; (2) the Legislature has incorrectly asserted that the challenged rule or regulation is inconsistent with "the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement," N.J. Const. art. V, § 4, ¶ 6 ; or (3) the Legislature's action violates a protection afforded by any other provision of the New Jersey Constitution, or a provision of the United States Constitution. To determine legislative intent, the court should rely exclusively on statutory language. It should not apply a presumption in favor of either the Legislature's findings or the agency's exercise of its rulemaking authority.
Applying that standard of review to the legislative veto at issue in these appeals, we find no procedural defect or constitutional infirmity in the Legislature's actions. We conclude that the Legislature correctly determined that N.J.A.C. 4A:3-3.2A conflicts with two provisions of the Civil Service Act, N.J.S.A. 11A:4-1 and N.J.S.A. 11A:4-8. Accordingly, we concur with the Appellate Division **495 panel that the Legislature properly invoked the Legislative Review Clause, and we affirm as modified its judgment.
I.
A.
The Legislative Review Clause, adopted as an amendment to the New Jersey Constitution in 1992, provides in relevant part:
The Legislature may review any rule or regulation to determine if the rule or regulation is consistent with the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement. Upon a finding that an existing or proposed rule or regulation is not consistent with legislative intent, the Legislature shall transmit this finding in the form of a concurrent resolution to the Governor and the head of the Executive Branch agency which promulgated, or plans to promulgate, the rule or regulation. The agency shall have 30 days to amend or withdraw the existing or proposed rule or regulation. If the agency does not amend or withdraw the existing or proposed rule or regulation, the Legislature may invalidate that rule or regulation, in whole or in part, or may prohibit that proposed rule or regulation, in whole or in part, from taking effect by a vote of a majority of the authorized membership of each House in favor of a concurrent resolution providing for invalidation or prohibition, as the case may be, of the rule or regulation. This vote shall not take place until at least 20 calendar days after the placing on the desks of the members of each House of the Legislature in open meeting of the transcript of *650 a public hearing held by either House on the invalidation or prohibition of the rule or regulation.
[ N.J. Const. art. V, § 4, ¶ 6.]
The Legislative Review Clause thus prescribes a two-phase procedure. In the first phase, the Legislature passes a concurrent resolution asserting an inconsistency between the disputed agency rule or regulation and the Legislature's intent, as expressed in the language of the enabling statute. Ibid. Following delivery of that resolution to the Governor and the head of the agency, the agency is afforded thirty days to reconcile the disputed rule or regulation with legislative intent by amending or withdrawing it. Ibid.
If the agency does not amend or withdraw the rule or regulation, the Legislature may commence the second phase of the process. Ibid. In that phase, a second concurrent resolution invalidating the rule or regulation is introduced in the Senate and General Assembly. Either house then holds a public hearing **496 regarding the invalidation of the rule or regulation and delivers a transcript of the hearing to the desk of each legislator. Ibid. Twenty days after the transcripts are delivered, the Senate and General Assembly may vote to pass the resolution invalidating the rule or regulation. Ibid.
Prior to the legislative veto that gave rise to these appeals, the Legislature had never invalidated a rule or regulation pursuant to the Legislative Review Clause.
B.
In March 2013, the Commission published amendments to Title 4A of the New Jersey Administrative Code (the Proposed Rule). 45 N.J.R. 500(a) (Mar. 18, 2013). The Commission stated that the Proposed Rule was intended "to codify a new job banding program that would apply to positions in both State and local service." 45 N.J.R. at 501.
The Commission acknowledged that it had been its established practice to administer competitive examinations for promotions in every job title in State service. Ibid. The Commission deemed that process -- which required the announcement of an opening, a determination of who is eligible to take the examination, the administration of the examination, and the certification of the highest ranking scores to the appointing authority -- to be inefficient. 45 N.J.R. at 505.
The Proposed Rule incorporated several significant amendments to that regulatory scheme. It introduced the concept of a "job band," defined as "a grouping of titles or title series into a single broad band consisting of title levels with similar duties, responsibilities, and qualifications." 45 N.J.R. at 507. It used the term "competency" to describe "the minimum level of training and orientation needed to successfully perform at a particular title level within a job band." Ibid. The Proposed Rule defined an "advancement appointment" as "a movement within a job band, upon achievement of a specific number of predetermined competencies, to a higher title level and, where applicable, associated **497 higher class code, which does not require competitive examination." Ibid.
The Proposed Rule also amended existing regulatory definitions. The term "promotion" was limited, in relation to State service positions, to "a movement to a title with a higher class code not in the employee's current job band." Ibid. The term "title," as applied to "titles approved for inclusion in job bands," was defined to "mean the title level within the job band, and, where applicable, the level's associated class code, unless otherwise stated, or the context clearly suggests otherwise." 45 N.J.R. at 508.
*651 The Commission explained that under the Proposed Rule, employees could advance between banded titles without competitive examinations, and that the appointing authority would have the discretion to choose among all of the candidates who demonstrated the required competencies, rather than choosing among the three highest-ranking eligibles pursuant to N.J.S.A. 11A:4-8. 45 N.J.R. at 505.
In the Commission's view, the constitutional and statutory mandate to conduct competitive examinations does not
require the application of the formal examination process in every instance in which an employee demonstrates (and the needs of the appointing authority require) that he or she has progressed from being able to perform "routine" level work to being able to perform "complex" level work associated with the title.
[45 N.J.R. at 502.]
It explained that an employee's progression -- treated in existing regulations "as a 'promotion' to the next higher, non-supervisory title in a title series" -- is more accurately viewed as the employee's advancement "to the point where he or she can be entrusted with higher level, non-supervisory duties." Ibid. The Commission concluded that there was "no Constitutional or statutory impediment to the advancement of employees to different levels within a single title without a formal, competitive examination." Ibid.
The Commission predicted that job banding would "streamline the selection process by eliminating duplicative promotional procedures, **498 while preserving the underlying principles of merit and fitness." Ibid.
On June 27, 2013, the Legislature passed a concurrent resolution declaring the Proposed Rule to be inconsistent with the legislative intent of the Civil Service Act.[1] A. Con. Res. 199 (2013) (enacted). In the concurrent resolution, the Legislature made the following findings:
The proposed new Job Banding Rule, N.J.A.C. 4A:3-3.2A, is contrary to the spirit, intent, and plain meaning of the provision in the New Jersey Constitution that requires that promotions be based on merit and fitness to be ascertained, as far as practicable, by examination, which, as far as practicable, shall be competitive.
The fact that the proposed new rule would eliminate competitive promotional examinations for tens of thousands of positions for which such exams have been administered for decades is compelling evidence that it is practicable to continue to determine the merit and fitness of candidates for such promotional positions by competitive examination in accordance with the New Jersey Constitution.
The proposed new rule is not consistent with the legislative intent that the public policy of this State is to select and advance employees on the basis of their relative knowledge, skills and abilities, ensure equal employment opportunity at all levels of public service, and protect career public employees from political coercion.
The proposed new rule is not consistent with the legislative intent that a competitive promotional examination process be established, maintained, and administered by the Civil Service Commission to ensure that promotions are based on *652 merit and fitness and are not based on patronage or discriminatory reasons.
The proposed new rule is not consistent with the legislative intent that whenever a veteran ranks highest on a promotional certification, a nonveteran shall not be appointed unless the appointing authority shall show cause before the commission why a veteran should not receive such promotion.
The proposed new rule is not consistent with the intent of the Legislature as expressed in the language of the Civil Service Act, including the spirit, intent, or plain meaning of N.J.S.A. 11A:3-1, N.J.S.A. 11A:4-1, N.J.S.A. 11A:4-8 or N.J.S.A. 11A:5-7.
[Ibid. ]
On December 4, 2013, the Legislature transmitted the concurrent resolution to the Commission and the Governor, thus commencing the thirty-day period for the Commission to amend or **499 withdraw the disputed rule under the Legislative Review Clause. The next day, however, the Senate commenced the second phase of the Legislative Review Clause by introducing a concurrent resolution invalidating the Proposed Rule. S. Con. Res. 166 (2013). The Senate held a public hearing regarding the concurrent resolution on December 12, 2013, thereby commencing the twenty-day period that the Legislature was required to wait before voting to invalidate the Proposed Rule. See N.J. Const. art. V, § 4, ¶ 6.
On December 23, 2013, the Commission announced amendments to the Proposed Rule (the First Amended Proposed Rule). See 46 N.J.R. 260(a) (Feb. 3, 2014). In the First Amended Proposed Rule, the Commission limited job banding to civilian, non-public safety job titles in State service. Ibid. It also confirmed the applicability of the Title 11A veterans' preference[2] to advancement appointments, and clarified remedies for alleged discrimination in job banding determinations. Ibid. On January 9, 2014, the Legislature passed a concurrent resolution to prohibit the adoption of the Proposed Rule.[3] A. Con. Res. 215 (2013) (enacted).
On May 7, 2014, the Commission adopted the First Amended Proposed Rule as N.J.A.C. 4A:3-3.2A, with an effective date of June 2, 2014. See 46 N.J.R. 1331(c) (June 2, 2014).
In the wake of the Commission's adoption of the First Amended Proposed Rule as N.J.A.C. 4A:3-3.2A, the Legislature recommenced the Legislative Review Clause procedure. On June 16, 2014, the Legislature passed a concurrent resolution declaring the First Amended Proposed Rule to be contrary to **500 Article VII, Section 1, Paragraph 2 of the New Jersey Constitution, and the legislative intent of the Civil Service Act.[4] S. Con. Res. 116 (2014) (enacted). In that concurrent resolution, the *653 Legislature restated the findings set forth in its prior concurrent resolutions, except to delete the finding that the Rule disregarded the veterans' preference, and the citation to N.J.S.A. 11A:5-7, which addresses the veterans' preference in promotion. Ibid. The concurrent resolution stated that "[a]ny amended rule that contains a job banding provision or elimination of competitive promotional examinations" would be deemed by the Legislature to violate Article VII, Section 1, Paragraph 2 and "the Civil Service Act, including the spirit, intent, or plain meaning of N.J.S.A. 11A:3-1, N.J.S.A. 11A:4-1, or N.J.S.A. 11A:4-8." Ibid.
The Legislature transmitted the concurrent resolution to the Commission and the Governor on June 17, 2014, thus commencing the thirty-day period for the Commission to amend or withdraw N.J.A.C. 4A:3-3.2A.
On July 16, 2014, the Commission proposed a third iteration of the job banding rule (the Second Amended Proposed Rule). 46 N.J.R. 1765(a) (Aug. 18, 2014). The Commission stated that in order to avoid "the potential abuses alleged" in the Legislature's latest concurrent resolution, it had amended the job banding rule in two respects. Ibid. First, the Second Amended Proposed Rule required an appointing authority to "obtain approval of the advancement appointment selection process from the Chairperson of the Commission or designee before administering such process." Ibid. Second, the Second Amended Proposed Rule required the appointing authority, after determining an advancement appointment, to "rank the candidates for the announced advancement appointment, taking into account veterans' preference, if applicable, ... and to document accordingly." Ibid.
**501 In the wake of the Commission's publication of its Second Amended Proposed Rule, the Legislature did not recommence the two-phase Legislative Review Clause process. Instead, on September 29, 2014, a new concurrent resolution was introduced in the General Assembly. See A. Con. Res. 192 (2014). That concurrent resolution addressed both the First Amended Proposed Rule, already adopted as N.J.A.C. 4A:3-3.2A, and the Second Amended Proposed Rule. Ibid. The Legislature acknowledged the Commission's amendments but stated that those amendments "would make only minor changes and are not responsive to the Legislature's finding ... that job banding is not consistent with legislative intent as expressed in the language of the Civil Service Act." Ibid. Accordingly, the Legislature declared that those amendments "do not in any way limit [its] ability to proceed with invalidating the job banding rule pursuant to [the Legislative Review Clause]." Ibid.
The Legislature thus resolved to invalidate N.J.A.C. 4A:3-3.2A"in its entirety" and declared that "any subsequent amendments to said regulation shall be deemed null and void." Ibid.
On October 22, 2014, the Commission adopted the Second Amended Proposed Rule as N.J.A.C. 4A:3-3.2A. 46 N.J.R. 2277(b) (Nov. 17, 2014). On December 18, 2014, the Legislature passed ACR-192, the final concurrent resolution at issue in this appeal, to invalidate the job banding rule.[5]
On February 9, 2015, the Chairman of the Commission issued a statement declaring *654 job banding to be consistent with the Constitution and the Civil Service Act. The Chairman further asserted that the Legislature failed to properly invalidate N.J.A.C. 4A:3-3.2A in light of the Commission's proposal of the Second Amended Proposed Rule. **502 The Commission subsequently approved two requests by appointing authorities to implement job banding pursuant to N.J.A.C. 4A:3-3.2A. In July 2015, the Commission authorized the Office of Information Technology to band four job titles "in order to streamline the appointment process with a more finely calibrated system which considers competencies and job performance." In re Job Banding for Software Dev. Specialist 1 & 2, & Network Adm'r 1 & 2, Office of Info. Tech., CSC No. 2016-651, at 2 (July 31, 2015). The Commission found that the key distinctions among the titles related to "the complexity of work performed and the level of supervision received" in the position, factors that could not accurately be tested by written examinations. Id. at 6.
The following month, the Commission authorized the Department of Transportation to band three Highway Operations Technician titles. In re Changes in the State Classification Plan & Job Banding Request, Dep't of Transp., CSC Nos. 2016-778, -779, at 4 (Aug. 21, 2015). The Commission again found that the titles differed from one another primarily with respect to "the complexity of work performed and the level of supervision received" in the position, and that an employee's ability to perform more complex work with less supervision could not accurately be measured by competitive examinations. Id. at 3.
The Commission's approval of the Office of Information Technology and Department of Transportation positions constituted final administrative determinations by the Commission, subject to appeal. See R. 2:2-3(a)(2).
C.
The Communications Workers of America, AFL-CIO (CWA), the International Federation of Professional and Technical Engineers, AFL-CIO (IFPTE), and the Senate President and the Speaker of the General Assembly challenged the Commission's adoption and implementation of the job banding rule in six appeals, five of which are now before the Court.[6] The Appellate **503 Division granted the Senate and the General Assembly leave to intervene in *655 the two appeals filed by the Senate President and the Speaker of the General Assembly.
The Appellate Division denied stay applications filed by the CWA and the IFPTE. It consolidated CWA's three appeals, but declined to consolidate the remaining three appeals.
In an opinion by Judge Fasciale, an Appellate Division panel held that the Legislature properly invoked the Legislative Review Clause to invalidate N.J.A.C. 4A:3-3.2A. Commc'ns Workers, 447 N.J. Super. at 606, 149 A.3d 844. The panel concluded that the deferential standard that ordinarily applies in appellate review of agency determinations should not govern an invocation of the Legislative Review Clause. Id. at 600, 149 A.3d 844. Although it afforded the Legislature "substantial deference" in exercising its legislative veto, the panel reasoned that the Legislative Review Clause neither limits appellate courts' "traditional role of interpreting the law," nor "preclude[s] the judicial branch from exercising its role to enforce the checks and balances embodied in the State Constitution." Id. at 600-01, 149 A.3d 844. The panel declared **504 that it retained its authority to review the Legislature's findings and conclusions to ensure that the Legislature has properly invalidated a rule or regulation rather than "passing new legislation, subject to the presentment clause." Id. at 601, 149 A.3d 844.
The panel prescribed a three-pronged standard to govern appellate review:
We therefore hold that we may reverse the Legislature's invalidation of an administrative executive rule or regulation if (1) the Legislature has not complied with the procedural requirements of the Legislative Review Clause; (2) its action violates the protections afforded by the Federal or New Jersey Constitution; or (3) the Legislature's concurrent resolution amounts to a patently erroneous interpretation of "the language of the statute which the rule or regulation is intended to implement."
[ Ibid. (quoting N.J. Const. art. V, § 4, ¶ 6 ).]
Applying that standard to the dispute before it, the panel concluded that the Legislature had complied with the Legislative Review Clause's procedural requirements. Id. at 602-03, 149 A.3d 844. The panel found no violation of federal or state constitutional norms in the Legislature's action. Id. at 606, 149 A.3d 844. Finally, the panel concluded that the Legislature's determination that there was a conflict between the job banding rule and the Civil Service Act "does not amount to a patently erroneous interpretation of the language of the [statute]." Id. at 603, 149 A.3d 844. It reversed the Commissioner's final agency determinations, and vacated the implementation of N.J.A.C. 4A:3-3.2A. Id. at 606, 149 A.3d 844.
We granted the Commission's petition for certification. 229 N.J. 590, 164 A.3d 392 (2017).[7]
**505 II.
The Commission argues that the Legislature failed to comply with the Legislative *656 Review Clause's procedural requirements when it exercised its legislative veto. It asserts that the Civil Service Act authorizes it to institute the practice of job banding and that job banding is not inconsistent with the Act's provisions regarding competitive examinations. The Commission contends that the Legislature improperly invoked the Legislative Review Clause to divest the Commission of its statutory authority and to manage an executive agency, thereby violating the New Jersey Constitution's separation of powers provision, N.J. Const. art. III, ¶ 1, and its Presentment Clause, N.J. Const. art. V, § 1, ¶ 14. The Commission urges the Court not to defer to the Legislature's veto of N.J.A.C. 4A:3-3.2A because that veto unconstitutionally abrogates executive authority.
The Senate President, the Speaker of the General Assembly, the Senate, and the General Assembly argue that the Appellate Division panel conducted appropriate judicial review in these appeals and urge the Court to affirm the panel's judgment. They contend that the Legislature complied with the procedural and substantive requirements of the Legislative Review Clause, that it properly identified a conflict between the Civil Service Act's competitive examination provisions and the Commission's job banding rule, and that it acted within the authority conferred on it by the Legislative Review Clause when it invalidated that regulation.
The CWA agrees that the Legislature complied with the Legislative Review Clause's procedural provisions and urges the Court to defer to the Legislature's finding of a conflict between the Civil Service Act and N.J.A.C. 4A:3-3.2A. The CWA characterizes the passage of a concurrent resolution as "an action squarely within the wheelhouse of the legislative branch of government" that is **506 entitled to the same deference as that afforded to a statute. It contends that the Legislature properly concluded that N.J.A.C. 4A:3-3.2A contravened legislative intent, as expressed in N.J.S.A. 11A:3-1, N.J.S.A. 11A:4-1, and N.J.S.A. 11A:4-8.
The IFPTE recognizes "no role for strict judicial review of the Legislature's findings that a regulation is contrary to legislative intent." It contends that if the Legislature follows the procedures prescribed by the Legislative Review Clause, judicial scrutiny of a veto should be limited to whether the Legislature has acted in a manner "repugnant to the Constitution." The IFPTE urges the Court to apply that proposed standard of review to uphold the legislative veto at issue in these appeals.
III.
We first determine the standard by which a court reviews a legislative veto under the Legislative Review Clause.
That determination begins with the language of the provision itself. See State v. Buckner, 223 N.J. 1, 15, 121 A.3d 290 (2015) ("To understand the meaning and intent of a constitutional provision, courts look first to the plain language the framers used."); Comm. to Recall Robert Menendez from the Office of U.S. Senator v. Wells, 204 N.J. 79, 105, 7 A.3d 720 (2010) (same). "If the language is straightforward, 'the words used must be given their plain meaning.' " Buckner, 223 N.J. at 15, 121 A.3d 290 (quoting State v. Trump Hotels & Casino Resorts, 160 N.J. 505, 527, 734 A.2d 1160 (1999) ). A constitutional provision "must be interpreted and applied in a manner 'that serves to effectuate fully and fairly its overriding purpose.' " Trump Hotels, 160 N.J. at 527, 734 A.2d 1160 (quoting Dickinson v. Fund for Support of Free Pub. Schs., 95 N.J. 65, 95, 469 A.2d 1 (1983) (Handler, J., dissenting in part) ).
*657 In our analysis, we strive to harmonize competing constitutional provisions. State v. Muhammad, 145 N.J. 23, 44, 678 A.2d 164 (1996). We "consider[ ] all the parts [of the Constitution] as a **507 whole, and not one part as a separate and independent provision bearing no relation to the remainder." Behnke v. Highway Auth., 13 N.J. 14, 24, 97 A.2d 647 (1953).
A.
The Legislative Review Clause imposes a series of procedural requirements for an exercise of a legislative veto. The Legislature must state, in a concurrent resolution passed by both houses, its findings that an agency rule or regulation contravenes the legislative intent of the enabling statute. N.J. Const. art. V, § 4, ¶ 6. It must then "transmit [that] finding ... to the Governor and the head of the Executive Branch Agency" responsible for the rule's proposal. Ibid. If the agency does not withdraw or amend the rule during the thirty-day window that the Clause prescribes, either the General Assembly or the Senate holds a public hearing regarding the rule's invalidation, the transcript of which must be "plac[ed] on the desks of the members of each House." Ibid. When twenty days have elapsed after the delivery of the transcripts, the Legislature may vote to invalidate the rule. Ibid.
Those procedural requirements serve fundamental goals: to ensure that the executive agency and the public are on notice of the Legislature's objection to the rule or regulation and to grant the agency the opportunity to address that objection by amending or withdrawing the rule or regulation. If the Legislature has not complied with those requirements, its attempt to invalidate the agency's action is a nullity, and the reviewing court's inquiry ends.
B.
We next determine the scope of judicial review of the Legislature's finding that a rule or regulation is inconsistent "with the intent of the Legislature as expressed in the language" of the enabling act. N.J. Const. art. V, § 4, ¶ 6.
**508 1.
In our inquiry, we harmonize the Legislative Review Clause with two other constitutional provisions, the separation of powers provision, N.J. Const. art III, ¶ 1, and the Presentment Clause, N.J. Const. art. V, § 1, ¶ 14.
"[S]eparation of powers is a fundamental principle of American government, expressly provided for in the constitutions of many states, and implied in almost all the others and in the federal government from the creation of the three separate branches of government." David v. Vesta Co., 45 N.J. 301, 323, 212 A.2d 345 (1965) ; accord Commc'ns Workers of Am. v. Florio, 130 N.J. 439, 449, 617 A.2d 223 (1992). The New Jersey Constitution codifies the doctrine:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
[ N.J. Const. art. III, ¶ 1.]
Our Constitution vests "[t]he legislative power ... in a Senate and General Assembly." N.J. Const. art. IV, § 1, ¶ 1. It grants "[t]he executive power ... [to] a Governor." N.J. Const. art. V, § 1, ¶ 1. Finally, the Constitution vests "[t]he judicial power ... in a Supreme Court, a Superior Court, and other courts of limited jurisdiction." N.J. Const. art. VI, § 1, ¶ 1.
*658 The separation of powers provision "was designed to 'maintain the balance between the three branches of government, preserve their respective independence and integrity, and prevent the concentration of unchecked power in the hands of any one branch.' " Florio, 130 N.J. at 449, 617 A.2d 223 (quoting David, 45 N.J. at 326, 212 A.2d 345 ). The provision recognizes "that each branch of government is distinct and is the repository of the powers which are unique to it; the members or representatives of one branch cannot arrogate powers of another branch." Knight v. Margate, 86 N.J. 374, 388, 431 A.2d 833 (1981). Separation of powers "is premised on the theory that government works best **509 when each branch of government acts independently and within its designated sphere, and does not attempt to gain dominance over another branch." In re P.L. 2001, Chapter 362, 186 N.J. 368, 378, 895 A.2d 1128 (2006).
Nonetheless, "we have always recognized that the doctrine requires not an absolute division of power but a cooperative accommodation among the three branches of government." Florio, 130 N.J. at 449, 617 A.2d 223 ; accord Gen. Assembly v. Byrne, 90 N.J. 376, 382, 448 A.2d 438 (1982) ; Knight, 86 N.J. at 388, 431 A.2d 833. "[T]he doctrine necessarily assumes the branches will coordinate to the end that government will fulfill its mission." Brown v. Heymann, 62 N.J. 1, 11, 297 A.2d 572 (1972). The purpose of the separation of powers doctrine "is not to create three 'watertight' governmental compartments, stifling cooperative action among the executive, legislative and judicial branches," but to "guarantee a system in which one branch cannot claim or receive an inordinate power." In re P.L. 2001, 186 N.J. at 379, 895 A.2d 1128 (quoting Florio, 130 N.J. at 450, 617 A.2d 223 (brackets removed) ).
Closely aligned with the separation of powers provision is our Constitution's Presentment Clause, N.J. Const. art. V, § 1, ¶ 14. That Clause provides in part:
When a bill has finally passed both houses, the house in which final action was taken to complete its passage shall cause it to be presented to the Governor before the close of the calendar day next following the date of the session at which such final action was taken.
[ N.J. Const. art. V, § 1, ¶ 14.]
A bill presented to the Governor becomes law:
(1) if the Governor approves and signs it within the period allowed for his consideration; or,
(2) if the Governor does not return it to the house of origin, with a statement of his objections, before the expiration of the period allowed for his consideration; or,
(3) if, upon reconsideration of a bill objected to by the Governor, two-thirds of all the members of each house agree to pass the bill.
[Ibid. ]
The Presentment Clause bars "the exercise of law-making power without the concurrence of both houses of the **510 Legislature and approval by the Executive, unless the Legislature can muster a two-thirds majority vote of both houses to override the executive veto." Gen. Assembly, 90 N.J. at 384, 448 A.2d 438 ; cf. INS v. Chadha, 462 U.S. 919, 946, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("[T]he requirement that all legislation be presented to the President before becoming law was uniformly accepted by the Framers."). It confirms that all statutes, unless passed by two-thirds of both houses of the Legislature after a veto, will be enacted with "the concurrence of both houses ... and approval *659 by the Executive." Gen. Assembly, 90 N.J. at 384, 448 A.2d 438.
Like the separation of powers provision, the Presentment Clause was enacted to prevent "unwarranted legislative interference with the executive branch and excessive legislative law-making power." Id. at 385, 448 A.2d 438. The Framers sought to ensure that "no legislative action may have substantial policy-making effects without the approval of the Governor or a two-thirds vote of both houses of the Legislature." Id. at 389, 448 A.2d 438.
The Presentment Clause, however, does not mandate that "every legislative action require[ ] the approval of both houses and presentment to the Governor." Enourato v. Bldg. Auth., 90 N.J. 396, 408, 448 A.2d 449 (1982). To assess a legislative action's conformity with the Presentment Clause, a reviewing court determines whether the challenged action effects "a subsequent legislative nullification of a policy that a former Legislature enacted into law." Id. at 407, 448 A.2d 449.
Before our Constitution was amended to adopt the Legislative Review Clause, this Court invoked the separation of powers doctrine and the Presentment Clause to strike down an unrestricted legislative veto provision enacted by statute in General Assembly, 90 N.J. at 385-95, 448 A.2d 438. The Court articulated principles in General Assembly that guide our determination of these appeals.
**511 In 1981, the Legislature unanimously overrode a veto by Governor Byrne to enact the Legislative Oversight Act, L. 1981, c. 27. See id. at 379, 448 A.2d 438. That Act required that all new and amended regulations, except those mandated by federal law or related to an emergency affecting the public health, safety, or welfare, be submitted to the Legislature for review and approval. L. 1981, c. 27, §§ 1, 4. Pursuant to the Legislative Oversight Act, if the Legislature disapproved of the rule, it was authorized to adopt a concurrent resolution invalidating the rule within sixty days of its receipt of that rule. L. 1981, c. 27, § 3.
In General Assembly, this Court rejected an application for a declaratory judgment stating that the Legislative Oversight Act was constitutional. 90 N.J. at 385-95, 448 A.2d 438. It acknowledged the nexus between the separation of powers doctrine and the Presentment Clause, noting that "[a]ny legislative action that so removes the Governor from law making as to violate the Presentment Clause, Art. V, § 1, ¶ 14, threatens the separation of powers." Id. at 385, 448 A.2d 438. The Court identified the constitutional provisions' dual objectives:
To determine whether legislative action violates either clause, the Court must bear in mind the two purposes of both provisions: preventing unwarranted legislative interference with the executive branch and excessive legislative law-making power. In a scheme of government that frequently requires cooperation between the branches of government, we cannot decide what constitutes excessive legislative power merely by intoning the abstract principles of separation of powers. To judge the constitutionality of the legislative veto provision in [the Legislative Oversight Act], the Court must determine its practical effects upon law making and law enforcement.
[ Ibid. (citation omitted).]
The Court deemed the "extremely broad legislative veto" authorized by the Legislative Oversight Act to "frustrate[ ] the Executive's constitutional mandate to faithfully execute the law." Ibid."Even where the Legislature is not using its veto power to effectively change the law," the Court noted, *660 "the veto can illegitimately interfere with executive attempts to enforce the law." Id. at 386, 448 A.2d 438. **512 The Court also held that the Act violated the separation of powers doctrine and the Presentment Clause "by giving the Legislature excessive power." Id. at 395-96, 448 A.2d 438. It observed that
[t]he legislative veto gives the Legislature unlimited potential to block any rules promulgated pursuant to a particular statute. The Legislature can use this power to exert a policy-making effect equivalent to amending or repealing existing legislation. A veto which effectively amends or repeals existing law offends the Constitution because it is tantamount to passage of a new law without the approval of the Governor. This violates the separation of powers, N.J. Const. (1947), Art. III, ¶ 1, and the Presentment Clause, Art. V, § 1, ¶ 14.
[ Id. at 388, 448 A.2d 438.]
The Court noted that "the Legislature cannot circumvent the constitutional requirement of presentment to the Governor merely by passing a statute which allows such a procedure." Id. at 391, 448 A.2d 438.
The Court prescribed the following standard to determine whether a legislative veto provision violates separation of powers principles and the Presentment Clause: "Where legislative action is necessary to further a statutory scheme requiring cooperation between the two branches, and such action offers no substantial potential to interfere with exclusive executive functions or alter the statute's purposes, legislative veto power can pass constitutional muster." Id. at 395, 448 A.2d 438 ; see also Enourato, 90 N.J. at 401, 448 A.2d 449.[8]
The Court's decision in General Assembly provoked "a legislative response ... that was extraordinarily prompt by any standard."
**513 Kimmelman v. Burgio, 204 N.J. Super. 44, 48, 497 A.2d 890 (App. Div. 1985). On the very day that General Assembly was decided, the Legislature passed a concurrent resolution proposing a constitutional amendment. Under that proposal, Article V, Section 4, Paragraph 6 would have been amended to authorize the Legislature, by a majority of the authorized membership of each House, to "invalidate any rule or regulation, in whole or in part," and to "prohibit any proposed rule or regulation, in whole or in part." S. Con. Res. 133 (1982).[9] In the 1985 general election, however, the voters rejected the proposed constitutional amendment. See Public Question No. 7 (1985), http://www.njelections.org/election-results/1985-public-questions.pdf.
The Legislative Review Clause approved by the voters in 1992 is a grant of a far *661 more limited power. See Public Question No. 4 (1992), http://www.njelections.org/election-results/1992-public-questions.pdf. The Clause does not purport to confer on the Legislature the unfettered authority to veto executive agency rules and regulations envisioned by the Legislative Oversight Act and the rejected amendment of 1985. N.J. Const. art. V, § 4, ¶ 6. Nor does it authorize the Legislature to use the veto power to amend the enabling statute, thus circumventing the Presentment Clause. See Gen. Assembly, 90 N.J. at 391, 448 A.2d 438. By virtue of its limiting language, the Clause follows the constitutional principles of General Assembly.
2.
Against that backdrop, we consider the scope of judicial review.[10] As this Court has long recognized, when the Legislature **514 exercises its constitutional authority to make laws, its actions are afforded highly deferential judicial review. Courts "can and should exercise caution and defer to [legislative] solutions when appropriately drafted by the Legislature." In re Adoption of N.J.A.C. 5:96, 215 N.J. 578, 616, 74 A.3d 893 (2013) ; see also Gangemi v. Berry, 25 N.J. 1, 9, 134 A.2d 1 (1957) (stating that Legislature is entrusted "with the general authority to make laws at discretion" (internal quotation marks omitted) ). A party seeking a ruling that a statute is unconstitutional "must hurdle '[t]he strong presumption of constitutionality that attaches' " to a statute. Buckner, 223 N.J. at 14, 121 A.3d 290 (alteration in original) (quoting Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 285, 716 A.2d 1137 (1998) ). When a statute is challenged on constitutional grounds, it will be upheld unless its "repugnancy to the constitution is clear beyond a reasonable doubt." Ibid. (emphasis removed) (quoting Gangemi, 25 N.J. at 10, 134 A.2d 1 ); accord Trump Hotels, 160 N.J. at 527, 734 A.2d 1160. "When reasonable people 'might differ' about the constitutionality of a law, courts 'must defer[ ] to the will of the lawmakers.' " Buckner, 223 N.J. at 15, 121 A.3d 290 (alteration in original) (quoting N.J. Ass'n on Corr. v. Lan, 80 N.J. 199, 220, 403 A.2d 437 (1979) ).
In its rulemaking function, an executive agency is similarly afforded substantial deference. When it establishes an administrative agency, the Legislature "delegate[s] the primary authority of implementing policy in a specialized area to governmental bodies with the staff, resources, and expertise to understand and solve those specialized problems."
**515 Bergen Pines Cty. Hosp. v. Dep't of Human Servs., 96 N.J. 456, 474, 476 A.2d 784 (1984). We "defer to an agency's interpretation of both a statute and implementing regulation, within the sphere of the agency's authority, unless the interpretation is 'plainly unreasonable.' " In re Election Law Enforcement Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262, 989 A.2d 1254 (2010) (quoting Reilly v. AAA Mid-Atl. Ins. Co. of N.J., 194 N.J. 474, 485, 946 A.2d 564 (2008) ).
*662 An appellate court may reverse an agency decision only if it is arbitrary, capricious, or unreasonable. In re Proposed Quest Acad. Charter Sch., 216 N.J. 370, 385, 80 A.3d 1120 (2013). Judicial review is limited to three inquiries:
(1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[ In re Petitions for Rulemaking, 117 N.J. 311, 325, 566 A.2d 1154 (1989).]
In these appeals, however, we review neither a challenge to a statute's constitutionality nor an agency's routine exercise of its rulemaking authority. Instead, we confront a discrete issue: whether the Legislature properly invoked its authority under the Legislative Review Clause.
It is clear that the Clause expanded legislative oversight of agency rules and regulations. See Hunterdon Med. Ctr. v. Township of Readington, 195 N.J. 549, 571 n.15, 951 A.2d 931 (2008) (observing that "the Legislature's authority to challenge regulations with which it disagrees has only increased" with amendment of Article V, Section 4, Paragraph 6 ); In re Adoption of Regulations Governing the State Health Plan, 135 N.J. 24, 28, 637 A.2d 1246 (1994) (characterizing Legislative Review Clause as "a strong statement of the allocation of power between the state department and the Legislature"). The voters, however, granted that expanded authority in only one setting: the Legislature may exercise its power to veto a rule or regulation promulgated by the Executive in the event of an actual conflict between the rule or **516 regulation and the intent of the Legislature as reflected in the language of the enabling statute. N.J. Const. art. V, § 4, ¶ 6.
Were we to presume that any legislative invocation of the Legislative Review Clause is correct, we would risk abrogating executive rulemaking authority in violation of the Presentment Clause and separation of powers. As the Court has noted, "no deviation from the ... separation of powers [doctrine] will be tolerated which impairs the essential integrity of one of the [three] branches of government." In re P.L. 2001, 186 N.J. at 379, 895 A.2d 1128 (alterations in original) (quoting Massett Bldg. Co. v. Bennett, 4 N.J. 53, 57, 71 A.2d 327 (1950) ). When the Legislature and Executive dispute the parameters of their constitutional powers, the separation of powers doctrine mandates vigilant judicial review:
Although both the giving and taking of power can be constitutional if not excessive, the taking of power is more prone to abuse and therefore warrants an especially careful scrutiny. The case before us is one in which the Legislature has taken for itself a power normally lodged in the executive branch. Therefore, our deference to the Legislature must be accompanied by the most thorough and careful review to guard against the encroachment of one co-equal branch of government on another.
[ Florio, 130 N.J. at 457, 617 A.2d 223.]
Consistent with that principle, we do not review either the Legislature's construction of the enabling statute, or the agency's position that its regulation conformed with that statute, with the broad deference that typically governs judicial review. When a court reviews the Legislature's finding that there is a conflict between the enabling statute and the rule or regulation, no presumption should operate *663 in favor of the position taken by either branch. Instead, the court should simply determine whether the Legislature's finding that the rule or regulation conflicts with statutory language is correct.
The court should be guided in that inquiry exclusively by the statutory text, not by extrinsic evidence of legislative intent. That limitation effectuates the language ratified by the voters. See N.J. Const. art. V, § 4, ¶ 6 (authorizing Legislature to determine whether administrative rule or regulation promulgated by executive **517 agency "is consistent with the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement"). It also serves the objectives of the separation of powers provision and the Presentment Clause because it tethers the veto power to the language of a statute passed by the Legislature and signed by the Governor. See Gen. Assembly, 90 N.J. at 388, 448 A.2d 438 (noting need to ensure that veto is not exercised in manner that "effectively amends or repeals existing law" without Governor's approval).
C.
We concur with the Appellate Division that a reviewing court should also determine whether the Legislature's invocation of the Legislative Review Clause contravenes any other provision of the New Jersey Constitution, or any provision of the United States Constitution. Commc'ns Workers, 447 N.J. Super. at 601, 149 A.3d 844.
D.
In sum, an appellate court should reverse the Legislature's invalidation of an administrative rule or regulation pursuant to the Legislative Review Clause if (1) the Legislature has not complied with the procedural requirements of the Clause; (2) the Legislature has incorrectly asserted that the challenged rule or regulation is inconsistent with "the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement," N.J. Const. art. V, § 4, ¶ 6 ; or (3) the Legislature's action violates a protection afforded by any other provision of the New Jersey Constitution, or a provision of the United States Constitution. If the court finds that none of those standards have been contravened, it should affirm the Legislature's action.
E.
In Justice LaVecchia's opinion, our concurring and dissenting colleagues refute arguments that are not asserted in this opinion.
**518 See post at 540-44, 191 A.3d at 677-79. It is beyond dispute that when the voters approved the Legislative Review Clause, they expanded the Legislature's authority to nullify executive agency rules, if those rules contravene legislative intent as expressed in an enabling statute's language. Supra at 515-16, 191 A.3d at 661-62; see also N.J. Const. art. V, § 4, ¶ 6. It is equally clear that when the Legislature exercises its authority to make laws, it is entitled to substantial deference in judicial review. Supra at 513-15, 191 A.3d at 661. Notwithstanding the contentions set forth in the concurring and dissenting opinion, the standard adopted in this appeal is not premised on the notion that the Clause grants to the Executive a corollary power to interpret the enabling statute, or that judicial review turns on the agency's view of what constitutes valid execution of the law. To the contrary, that standard affords no deference to the views of the executive agency. See supra at 515-16, 191 A.3d at 661-63.
There is only one point of dispute between this opinion and that of our concurring *664 and dissenting colleagues: the second component of the three-pronged standard governing judicial review of the Legislature's invocation of the Legislative Review Clause. Applying that aspect of the test, a reviewing court determines whether the Legislature has incorrectly asserted that the challenged rule or regulation is inconsistent with the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement. That language is not a judicial invention; it is derived directly from the text of the Clause itself. See N.J. Const. art. V, § 4, ¶ 6.
Criticizing that test as conclusory and incongruent with the Legislative Review Clause, post at 540-42, 191 A.3d at 677-78, our concurring and dissenting colleagues offer as an alternative a standard premised on the Legislature's "reasonable interpretation" of its statute, post at 546, 191 A.3d at 680. The only three cases cited by our concurring and dissenting colleagues in support of that standard do not address the setting of this case. See **519 White v. Wheeler, 577 U.S. ----, 136 S.Ct. 456, 460-62, 193 L.Ed.2d 384 (2015) (holding that federal court reviewing state court's excusal of juror under Antiterrorism and Effective Death Penalty Act must be "doubly deferential" (internal quotation marks omitted) ); Turner Broad. Sys. v. FCC, 520 U.S. 180, 195-96, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (according "substantial deference to the predictive judgments of Congress" when Congress creates national policy and "out of respect for its authority to exercise the legislative power"); Roe v. Kervick, 42 N.J. 191, 229, 199 A.2d 834 (1964) (acknowledging principle of "judicial deference to the will of the lawmakers" in challenge to constitutionality of appropriations under redevelopment law). More importantly, that "reasonable interpretation" language is found nowhere in the Legislative Review Clause.
Under the standard stated in this opinion, if the Legislature has correctly identified a conflict between statutory language and the disputed rule or regulation, then it has properly invoked the Clause, and its action is upheld. If not, then the limiting language that the voters adopted in the Legislative Review Clause -- language that harmonizes the Clause with the separation of powers doctrine and the Presentment Clause -- constrains the legislative veto. That judicial determination, grounded in the constitutional text, accurately reflects the Legislature's intent when it proposed the Legislative Review Clause, and the voters' intent when they approved it.
IV.
In accordance with that standard, we review the legislative veto invalidating N.J.A.C. 4A:3-3.2A.
A.
We first address the Legislature's compliance with the Legislative Review Clause's procedural requirements.
The Commission contends that after the Legislature challenged the Proposed Rule by concurrent resolution, it accelerated the **520 schedule for the second phase of the Legislative Review Clause procedure by holding a public hearing and passing a concurrent resolution on the first day of the thirty-day period in which the agency may amend or withdraw the rule. We agree. The Clause provides that after the transmittal of the resolution to the Executive Branch, the agency "shall have 30 days to amend or withdraw the existing or proposed rule or regulation." N.J. Const. art. V, § 4, ¶ 6. It further prescribes that the Legislature may invalidate a rule or regulation "[i]f the agency does not amend or withdraw the existing or proposed rule or regulation." Ibid. *665 Accordingly, the Legislative Review Clause does not authorize the Legislature to take further action against an agency for thirty days after it delivers its findings in a concurrent resolution to the Governor and the head of the agency. See Office of Legislative Servs., New Jersey Legislature Legislator's Handbook 26 (2016-2017 ed.) (stating that after Legislature transmits its concurrent resolution stating its findings to Governor and executive agency, it "waits 30 days for the executive agency to withdraw or amend the rule or regulation"). Thus, the Legislature prematurely commenced the Legislative Review Clause's second phase in its challenge to the original Proposed Rule.
That does not affect its second invalidation of N.J.A.C. 4A:3-3.2A, which is the operative legislative action for purposes of these appeals, however. In that second invocation of its legislative veto power, the Legislature took no action during the thirty-day period for the Commission to amend or withdraw the published rule. Accordingly, the timing of the Legislature's first exercise of the Clause has no impact on our determination.
The Commission also asserts that there was a procedural defect in the Legislature's subsequent challenge to N.J.A.C. 4A:3-3.2A. It contends that when it proposed the Second Amended Proposed Rule within the thirty-day window, the Legislature was required to restart the Legislative Review Clause process anew and to make findings specific to the Second Amended Proposed Rule in a revised concurrent resolution. Instead, the Legislature declined to **521 address the Second Amended Proposed Rule and prospectively invalidated any future amendments.
The Clause does not specifically address a setting in which the agency amends the rule or regulation but the Legislature finds that amendment to be inadequate to address its concerns. The provision's objective of ensuring that rules and regulations comport with their enabling statutes, however, would be undermined if an agency could indefinitely forestall a legislative veto by a succession of minor amendments that do not resolve the Legislature's concern.
After the Commission's second set of amendments to its proposed rule and its adoption of N.J.A.C. 4A:3-3.2A, the Commission amended the Rule only to provide for additional administrative oversight of the advancement appointment selection process and to require the appointing authority to rank candidates and document that ranking. The Legislature correctly determined that the amendments did not address its objections, and properly proceeded to invalidate that regulation.[11]
We therefore concur with the Appellate Division's conclusion that there was no procedural defect in the Legislature's exercise of its authority under the Legislative Review Clause.
B.
1.
We next consider whether N.J.A.C. 4A:3-3.2A is consistent with the language of the Civil Service Act's relevant provisions.
**522 *666 The Civil Service Act governs civil service employment in New Jersey, which includes all positions within state government and those within the political subdivisions that choose to adopt it and be governed by its terms. See N.J.S.A. 11A:2-11(e). The statute was enacted "to secure the appointment and advancement of civil service employees based on their merit and abilities." Commc'ns Workers of Am. v. Dep't of Pers., 154 N.J. 121, 126, 711 A.2d 890 (1998). "[T]he Act seeks to put civil service positions beyond political control, partisanship, and personal favoritism." Ibid.
The Civil Service Act grants to the Commission the authority to:
a. Establish, administer, amend and continuously review a State classification plan governing all positions in State service and similar plans for political subdivisions;
b. Establish, consolidate and abolish titles;
c. Ensure the grouping in a single title of positions with similar qualifications, authority and responsibility;
d. Assign and reassign titles to appropriate positions; and
e. Provide a specification for each title.
[ N.J.S.A. 11A:3-1.]
It directs the Commission to "promulgate, pursuant to the 'Administrative Procedure Act,' [ N.J.S.A. 52:14B-1 to -31], rules and regulations to effectuate the purposes of" the Civil Service Act. N.J.S.A. 11A:4-1.2. Those "purposes" are defined by the statute to include the selection and advancement of employees "on the basis of their relative knowledge, skills and abilities"; the encouragement and rewarding of "meritorious performance"; and the retention and separation of employees "on the basis of the adequacy of their performance." N.J.S.A. 11A:1-2. The Act's provisions addressing the manner in which employees are appointed to particular titles and promoted from one title to another are at the center of these appeals.
The Civil Service Act emphasizes the role of competitive examinations in appointment and promotion. The Act's legislative findings expressly acknowledge and reinforce **523 Article VII, Section I, Paragraph 2 of the New Jersey Constitution. See N.J.S.A. 11A:3-2.1. That constitutional provision states:
Appointments and promotions in the civil service of the State, and of such political subdivisions as may be provided by law, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination, which, as far as practicable, shall be competitive; except that preference in appointments by reasons of active service in any branch of the military or naval forces of the United States in time of war may be provided by law.
[ N.J. Const. art. VII, § 1, ¶ 2.]
That provision "does not require that merit and fitness be determined by competitive examination in every case, but only 'as far as practicable.' " Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 232, 486 A.2d 305 (1985) (quoting N.J. Const. art. VII, § 1, ¶ 2 ). As this Court observed, "[t]he framers of the Constitution recognized that although competitive examinations would be the general rule in Civil Service appointments and promotions, there would be situations where such examination would not be practicable, and they made explicit provision therefor." Falcey v. Civil Serv. Comm'n, 16 N.J. 117, 122-23, 106 A.2d 549 (1954).
Acknowledging that "appointments to certain types of employment are not readily made through a competitive examination process," N.J.S.A. 11A:3-2.1, the Civil Service Act divides the career service into a *667 competitive division and a noncompetitive division. N.J.S.A. 11A:3-2. In contrast to the "examination and certification" process governing advancement in the competitive division, the Act provides for "appointment" to titles in the noncompetitive division. N.J.S.A. 11A:4-13. The Commission has the authority to "assign and reassign such titles to each division and may provide for movement, including promotion, of employees from one division to the other." N.J.S.A. 11A:3-2.[12] **524 Like the noncompetitive division of the career service, the senior executive service, the State unclassified service, and the political subdivision unclassified service are exempt from the competitive examination provisions of the Civil Service Act. See N.J.S.A. 11A:3-3 to -5. The Act also permits the Commission to "waive an examination for an applicant who has a physical, mental, or emotional injury, impairment, or disability" that meets statutory criteria. N.J.S.A. 11A:7-13.[13]
In addition to stating the competitive examination requirement, the Civil Service Act addresses the procedure for those examinations and the appointments and promotions that derive from them. The Act charges the Commission to "provide for ... [t]he announcement and administration of examinations which shall test fairly the knowledge, skills and abilities required to satisfactorily perform the duties of a title or group of titles." N.J.S.A. 11A:4-1(a). Such "examinations may include, but are not limited to, written, oral, performance and evaluation of education and experience." Ibid. Vacancies "shall be filled by a promotional examination when considered by the commission to be in the best interest of the career service." N.J.S.A. 11A:4-2.
Following a competitive examination, the Commission is charged to "certify the three eligibles who have received the highest ranking on an open competitive or promotional list." N.J.S.A. 11A:4-8. The appointing authority is then permitted to **525 "select one of the three highest scoring candidates from an open competitive examination." In re Foglio, 207 N.J. 38, 45, 22 A.3d 958 (2011) (quoting Local 518, State Motor Vehicle Emps. Union v. DMV, 262 N.J. Super. 598, 603, 621 A.2d 549 (App. Div. 1993) ). That practice, known as the "Rule of Three," has "governed the certification of candidates to the appointing body as well as the appointing body's hiring discretion for over a century." Ibid. (citing L. 1908, c. 156, § 21).
We conclude that N.J.A.C. 4A:3-3.2A directly contradicts legislative intent as expressed in two provisions of the Civil Service Act, N.J.S.A. 11A:4-1 and N.J.S.A. 11A:4-8.
*668 First, contrary to one of the chief policy goals identified by the Legislature in N.J.S.A. 11A:3-2.1, the Commission's job banding rule authorizes promotions between banded titles in the competitive division without the competitive examinations addressed in N.J.S.A. 11A:4-1.
The Commission has broad authority to "[e]stablish ... and abolish titles"; "[a]ssign and reassign titles to appropriate positions"; and "[e]nsure the grouping in a single title of positions with similar qualifications, authority and responsibility." N.J.S.A. 11A:3-1. It is authorized to reallocate titles from the competitive division to the noncompetitive division, thereby obviating the need to administer competitive examinations in titles as to which they are impracticable. N.J.S.A. 11A:3-2.
In N.J.A.C. 4A:3-3.2A, however, the Commission seeks to do much more. For titles covered by the job banding rule, an employment action that would otherwise be considered a promotion requiring a competitive examination is renamed an "advancement appointment" exempt from the constitutional and statutory mandate. N.J.A.C. 4A:1-1.3. For job banded titles, N.J.A.C. 4A:3-3.2A does not require the Commission to find competitive examinations impracticable in order to dispense with those examinations. In short, N.J.A.C. 4A:3-3.2A obviates the need for the Commission to administer competitive examinations that N.J.S.A. 11A:4-1 would otherwise require.
**526 The Commission notes that in accordance with N.J.A.C. 4A:3-3.2A(d), an employee's competencies are regularly assessed, and advancement appointments are based on those competencies. It argues that for employees in job banded titles, these competency evaluations should be deemed to constitute the competitive examinations envisioned by Article VII, Section 1, Paragraph 2 and N.J.S.A. 11A:4-1.
That assertion, however, is belied by the terms of the regulation itself, which makes clear its purpose to eliminate competitive examinations in advancement between positions within a job band:
(b) The Civil Service Commission shall review titles and title series in State service to determine whether they are appropriate for job banding.
1. This determination shall be guided by whether a movement from one position to a higher level position may be achieved based on an evaluation of relative knowledge, skills, and abilities without resorting to competitive examination procedures, while still satisfying the State constitutional and statutory mandate for merit and fitness in selections and appointments.
[ N.J.A.C. 4A:3-3.2A(b)(1).]
Distinguishing the advancement procedures prescribed for job banded titles from those governing titles outside of the band, the job banding regulation provided that "[t]he movement to a supervisory title outside of the band shall be effected through promotional examination procedures." N.J.A.C. 4A:3-3.2A(i). In short, by the very terms of the job banding regulation, competency evaluations are distinct from competitive examinations, not their functional equivalent.
In the Social Impact statement of the Proposed Rule, the Commission underscored its position that its job banding rule would dispense with competitive examinations for job banded titles. 45 N.J.R. at 505. Describing the complex and time-consuming process of promotion by competitive examination, the Commission stated that "[i]t is the intention of the proposed new job banding program to streamline the selection process by eliminating duplicative promotional procedures, while preserving *669 the underlying principles of merit and fitness." Ibid. **527 Accordingly, when it introduced the Proposed Rule, the Commission did not assert that the competency evaluations envisioned by N.J.A.C. 4A:3-3.2A(d) satisfied the statutory requirement of competitive examinations. To the contrary, it argued that it could achieve the Civil Service Act's overriding objectives of merit and fitness in appointments in banded titles more efficiently without the cumbersome competitive-examination process. Ibid.
As the Commission candidly stated when it published the Proposed Rule, the evaluations used to determine advancement appointments between banded titles are distinct from the competitive examinations envisioned by Article VII, Section 1, Paragraph 2 and N.J.S.A. 11A:4-1. To the extent that such evaluations are substituted for competitive examinations in the competitive division, they are inconsistent with legislative intent, as expressed in the language of N.J.S.A. 11A:4-1.[14]
Second, N.J.A.C. 4A:3-3.2A directly contravenes N.J.S.A. 11A:4-8, the Civil Service Act provision codifying the "Rule of Three." Under the job banding regulation, the Commission does not certify three eligible candidates based on their ranking in a competitive examination, so that the appointing authority can select one of the three for the position, as N.J.S.A. 11A:4-8 **528 provides. Instead, when an appointing authority identifies a vacancy at a particular level within a job band, "it may consider all employees who have attained the predetermined competencies." N.J.A.C. 4A:3-3.2A(d)(1). The appointing authority then conducts "an advancement appointment selection process approved by the Chairperson or designee" and determines "which employee or employees may receive an advancement appointment," taking into account the veterans' preference set forth in the regulation. N.J.A.C. 4A:3-3.2A(d)(3). The "appointing authority" ranks the candidates and documents that ranking. Ibid. In short, for job banded titles, N.J.A.C. 4A:3-3.2A eliminates the statutory certification and appointment procedure prescribed by the Civil Service Act, directly contradicting the language of N.J.S.A. 11A:4-8.
Applying no presumption in favor of either the Legislature's contentions or the validity of the Commission's regulation, we conclude that the Legislature properly invoked the Legislative Review Clause, N.J. Const. art. V, § 4, ¶ 6. The Legislature correctly found the job banding practice prescribed by N.J.A.C. 4A:3-3.2A to be inconsistent with legislative intent, as expressed in the language of two Civil Service *670 Act provisions, N.J.S.A. 11A:4-1 and N.J.S.A. 11A:4-8.
2.
In his concurring and dissenting opinion, Justice Solomon asserts that this opinion authorizes the Legislature to invalidate executive action based on what he terms the "legislative spirit" of the Civil Service Act, thereby contravening separation of powers principles. Post at 557-58, 191 A.3d at 687-88. The Legislature's concurrent resolutions invalidating N.J.A.C. 4A:3-3.2A cited the "spirit" of various provisions of the Civil Service Act as well as its "intent" and "plain meaning." S. Con. Res. 116; A. Con. Res. 192. To the extent that the Legislature intended to rely on the "spirit" of the Civil Service Act as distinct from its express language, its invocation of the statute's "spirit" is immaterial to our analysis. In accordance with the express language of the Legislative Review **529 Clause, we consider only whether N.J.A.C. 4A:3-3.2A is "consistent with the intent of the Legislature as expressed in the language" of the Civil Service Act. N.J. Const. art. V, § 4, ¶ 6.
Notwithstanding the view expressed by our concurring and dissenting colleagues, that inquiry reveals a significant disparity between statute and rule. The concurring and dissenting opinion stresses that N.J.A.C. 4A:3-3.2A's advancement appointment selection process fairly assesses competing candidates' skills and experience, and that the process constitutes, in effect, the "competitive examinations" envisioned by N.J.S.A. 11A:4-1 and 11A:4-8. Post at 551-52, 554-55, 191 A.3d at 683-84, 685-86.
Not even the Commission, however, suggests that advancement appointments are competitive examinations within the meaning of either Article VII, Section I, Paragraph 2 of the New Jersey Constitution or N.J.S.A. 11A:4-1 and 11A:4-8.[15] To the contrary, the Commission maintains that the grouping of multiple titles within a single band would further constitutional and statutory objectives to promote merit and fitness in public employment as it obviates the need for competitive examinations in the advancement of employees within a given band. N.J.A.C. 4A:3-3.2A(b)(1).
In short, the Commission's stated intent was not simply to redesign competitive examinations in the advancement of employees within a job band, as our colleagues suggest, but to eliminate competitive examinations in that setting. Ibid.; see also N.J.A.C. 4A:3-1.2(b) ("A career service job title in the competitive division is subject to the competitive examination procedures of N.J.A.C. 4A:4-2, except as provided in N.J.A.C. 4A:3-3.2A.").
Moreover, our concurring and dissenting colleagues cannot reconcile N.J.A.C. 4A:3-3.2A with N.J.S.A. 11A:4-8, the Civil Service **530 Act provision that codifies the "Rule of Three." The job banding rule abandons the statutory practice by which the Commission certifies three qualified candidates and the appointing authority selects one of those three candidates for the position; it instead authorizes the appointing authority to select from all employees with predetermined competencies for the position. Compare N.J.A.C. 4A:3-3.2A(d)(1) ("When an appointing authority determines a need to fill a position at a particular level within a band, it may consider for advancement appointment all employees who have attained the predetermined *671 competencies."), with N.J.S.A. 11A:4-8 (prescribing that Commission "shall certify the three eligible who have received the highest ranking on an open competitive or promotional list" and that appointment "shall be made from among those eligible").
The statutory language belies the notion, suggested in the concurring and dissenting opinion, that the Rule of Three has only a limited application to the civil service appointment and promotion process, and that it does not conflict with the job banding rule. Post at 555-56, 191 A.3d at 686. See In re Foglio, 207 N.J. at 45-46, 22 A.3d 958 (discussing respective roles of Commission and appointing authority under N.J.S.A. 11A:4-8"Rule of Three" procedure).
Our concurring and dissenting colleagues suggest that the "Rule of Three" could be incorporated into a job banding process. Post at 555-56, 191 A.3d at 686. Whether or not that is so, the regulation before the Court does not attempt -- let alone accomplish -- such integration. See N.J.A.C. 4A:3-3.2A(d)(1) ; 46 N.J.R. at 1339 ("The Rule of Three is not applicable to advancements under job banding, since these are not open or promotional appointments under N.J.S.A. 11A:4-8."). By its own terms, N.J.A.C. 4A:3-3.2A is simply incompatible with the "Rule of Three" provision set forth in N.J.S.A. 11A:4-8.
Our concurring and dissenting colleagues argue that the Legislature's exercise of its veto authority under the Legislative Review Clause violates constitutional principles.
**531 Post at 549-50, 557-58, 191 A.3d at 682-83, 687-88. We disagree. As the voters authorized it to do, the Legislature invalidated N.J.A.C. 4A:3-3.2A because it is inconsistent "with the intent of the Legislature as expressed in the language" of the Civil Service Act. N.J. Const. art. V, § 4, ¶ 6.
C.
Finally, we do not find any violation of a protection afforded by any other provision of the New Jersey Constitution, or by the United States Constitution, in the legislative veto at issue in these appeals. Because the Legislature exercised its veto power based on a proper finding that N.J.A.C. 4A:3-3.2A contravened the language of provisions of the Civil Service Act, that veto comports with the separation of powers doctrine, N.J. Const. art. III, ¶ 1, and the Presentment Clause, N.J. Const. art. V, § 1, ¶ 14. The Legislature's action implicates no other provision of the State Constitution, or any provision of the United States Constitution.
V.
We affirm as modified the judgment of the Appellate Division.
JUSTICE PATTERSON delivered the opinion of the Court as to both the applicable standard of review and the outcome in this appeal. JUSTICE LaVECCHIA filed a separate opinion -- concurring in the outcome in this appeal but dissenting as to the applicable standard of review -- in which JUSTICES ALBIN and TIMPONE join. JUSTICE SOLOMON filed a separate opinion -- concurring as to the applicable standard of review but dissenting as to the outcome in this appeal -- in which CHIEF JUSTICE RABNER and JUSTICE FERNANDEZ-VINA join.
JUSTICE LaVECCHIA, concurring in the judgment and dissenting in part.
In 1992, New Jersey voters approved a state constitutional amendment that worked a substantial change in the framework of State government. That constitutional amendment -- known as the **532 Legislative Review Clause -- gave the Legislature the power to veto an administrative agency's rule or regulation. N.J. Const. art. V, § 4, ¶ 6. *672 Now, more than two decades later, this appeal arises in the context of the Legislature's first and only use of that veto authority. Employing the Constitution's procedural steps, the Legislature utilized its veto power to invalidate N.J.A.C. 4A:3-3.2A, the "Job Banding Rule" promulgated by the Civil Service Commission (Commission). The Commission challenges the Legislature's veto of the Job Banding Rule as not lawful.
The appeal presents two questions. First, by what standard may a court review the Legislature's use of its constitutional veto power. Second, does the legislative veto at issue withstand challenge.
Because I agree that the Appellate Division rightly rejected the Commission's challenge, I and three other members of the Court comprise a majority to affirm the judgment of the Appellate Division.
However, I disagree with the standard of review in Justice Patterson's opinion, which is joined by three members of the Court. In my view, that Court-adopted standard for judicial review of the Legislature's use of its constitutional veto power fails to give due deference to the Legislature. For the reasons more fully set forth hereinafter, I respectfully dissent from the Court-adopted standard. When the Legislature exercises its constitutional veto power in a procedurally sound manner and invalidates an administrative agency's rule because the Legislature has determined that the rule contravenes legislative intent as expressed in the statutory authority for the rule, the Judiciary should afford that legislative determination substantial deference.
I.
A.
The voters of New Jersey amended the State Constitution in 1992 to add Article V, Section 4, Paragraph 6 to the powers **533 entrusted to the Legislature. The Legislative Review Clause permits the Legislature to review and invalidate Executive Branch administrative rules and regulations. N.J. Const. art. V, § 4, ¶ 6.
The amendment has a past, and that past is prologue to the question before us. To that history, I turn.
B.
The Legislature has long sought an oversight role concerning Executive Branch administrative rules and regulations. Undoubtedly, that is because of the shared responsibility between the two Branches for promulgated administrative rules and regulations, which carry the force and effect of law. As this Court well recognizes,
[m]any agency regulations differ little in their scope and effect from legislative commands. Yet, in our system of government, the Legislature and not the Executive must make the law. Administrative agency power derives solely from a grant of authority by the Legislature. The Legislature has the power to limit that scope of authority or even abolish it.
[ Gen. Assembly v. Byrne, 90 N.J. 376, 393, 448 A.2d 438 (1982).]
Certain bedrock principles of administrative law and agency rulemaking authority place into proper context the appropriate analysis for the question of the proper amount of judicial deference due to the Legislature in its exercise of its constitutional veto power. Administrative agencies are creatures of statute. In re Appeal of Certain Sections of Unif. Admin. Procedure Rules, 90 N.J. 85, 93, 447 A.2d 151 (1982) ("Agencies are specially created by *673 the Legislature to administer laws in accordance with the statutory duties that have been selectively delegated to them."). Each state agency operates pursuant to an enabling act that specifies the agency's mission and powers. See generally 37 Steven L. Lefelt, et al., New Jersey Practice: Administrative Law and Practice § 1.6 (2d ed. 2000). Sometimes the agency's enabling act includes a grant of specific means by which the Legislature expects the agency to fulfill statutory policy, such as the grant of rulemaking authority or adjudicative authority. See Abelson's, Inc. v. State Bd. of Optometrists, 5 N.J. 412, 423, 75 A.2d 867 (1950). **534 Such grants of authority are recognized as "grant[s] of administrative power for the execution of the statutory policy; and its exercise is of necessity restrained by the declared policy and spirit of the statute and the criteria and standards therein laid down." Ibid.; see also State Chamber of Commerce v. Election Law Enf't Comm'n, 82 N.J. 57, 82-83, 411 A.2d 168 (1980) (noting that even when broad rulemaking authority is granted, agency may not promulgate regulations that alter or frustrate terms or policy embodied in statute).
Thus, when an enabling statute delegates rulemaking power to an agency, as has been done in the present instance for the Commission, see N.J.S.A. 11A:2-6(d) (conferring broad rulemaking authority), the administrative agency has quasi-legislative power to promulgate rules that carry the force and effect of law because the Legislative Branch has authorized the rulemaking power, Abelson's, 5 N.J. at 423-24, 75 A.2d 867. And, rulemaking is not an impermissible delegation of "essential legislative power in contravention of constitutional limitations" when it is subject to proper legislative limits guiding the discretionary actions of the agency. Ibid. ("[R]ules and regulations ... cannot subvert or enlarge upon the statutory policy ... [and] cannot deviate from the principle and policy of the statute."). Tethering rulemaking authority to its delegation and to limitations expressed and implied by the principles and policy of the legislative grant of authority is essential. As this Court has explained, "[t]he distinction is between the making and the execution of the law." Id. at 423, 75 A.2d 867. In sum, an agency may promulgate regulations as valid administrative action, and not as impermissible legislative action, when authorized and subject to the limits of its authority delegated by the Legislature. Id. at 424, 75 A.2d 867.
Thus, there is an inherent tension in legislative grants of rulemaking authority, as the agency must implement the rulemaking responsibility entrusted to it without transgressing the limits of the delegated power received from the Legislature. To the extent there is ambiguity in an enabling statute, administrative **535 agencies have received, in challenges to the authority of a rule brought by a third party member of the public, the benefit of a liberal construction, particularly when public health or welfare are involved. N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978) ("[T]he grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and ... courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent."). However, legislative intent is the touchstone. And now, through the Legislative Review Clause, the Legislature gets its say about what its words in an enabling statute were intended to authorize an administrative agency to do when the agency exercises its delegated rulemaking authority. But that took a while for the Legislature to accomplish. *674 The 1980s marked the beginning of the Legislature's persistent endeavors to establish a legislative review over agency rules and regulations promulgated pursuant to legislative delegations of authority. The Legislature consistently made efforts to have a substantive say in whether an agency's regulations exceeded the legislative intent for the regulatory scheme entrusted to an agency for implementation.
The Legislature's first effort to accomplish that goal occurred when the Legislature overrode a gubernatorial veto to pass the Legislative Oversight Act (or "the Act"), L. 1981, c. 27 (codified at N.J.S.A. 52:14B-4.1 to -4.9). The Act required all new and amendatory regulations to be submitted to the Legislature for review and approval. L. 1981, c. 27, §§ 1, 2. Under the Act's new scheme for review of promulgated regulations, the Legislature had sixty days from receipt of a submitted rule to disapprove it through the adoption of a concurrent resolution. L. 1981, c. 27, § 3. The legislation contained no standard for the Legislature's exercise of its power to invalidate a rule. Ibid. The Act also gave disapproval authority to a newly created joint Legislative Oversight Committee, to which the Legislature also entrusted the review of rules to **536 ensure that the rules were "consistent with legislative intent, in accord with judicial findings, and within the scope of the promulgating agency's authority." L. 1981, c. 27, §§ 5, 6, 7. The Act stated that it applied to all rules, subject to an exception not relevant here. See L. 1981, c. 27, § 4.
The shift in power between the Branches of government wrought by the Legislative Oversight Act generated inter-Branch conflict.[1] That led the Legislature, in 1982, to file an action seeking a declaration that the Legislative Oversight Act was constitutional. Gen. Assembly, 90 N.J. at 378, 448 A.2d 438. The suit proved ultimately unsuccessful. On July 22, 1982, this Court declared the legislation unconstitutional under the State Constitution's Separation of Powers and Presentment Clauses. Id. at 395-96, 448 A.2d 438.
With respect to separation of powers, the Court held that the legislative veto "excessively" interfered with the functioning of the Executive Branch in two ways. Id. at 378, 448 A.2d 438. The Court determined that the statutorily created legislative "power to revoke at will portions of coherent regulatory schemes" was unconstitutional because it would "imped[e] the Executive in its constitutional mandate to faithfully execute the law." Ibid. The Court determined that the "legislative veto further offend[ed] the separation of powers [doctrine] by allowing the Legislature to effectively amend or repeal existing laws without participation by the Governor." Id. at 378-79, 448 A.2d 438. With respect to the **537 Presentment Clause, the legislative veto process enacted through the Act also was determined to contravene that Clause's procedural requirements, by which changes to legislative policy must occur "by a majority vote of both houses of the Legislature and approval by the Governor *675 or, after executive veto, by a two-thirds vote of both houses." Id. at 379, 448 A.2d 438.
The General Assembly decision left room for inter-Branch cooperation under the Constitution's provisions at the time. As noted in a companion case decided the same day, the Court underscored that "in General Assembly [, it] made clear that the separation of powers leaves room for some legislative oversight and participation in executive action. Not every legislative input into law enforcement [impermissibly] interferes with the Executive's law enforcement power." Enourato v. Bldg. Auth., 90 N.J. 396, 401, 448 A.2d 449 (1982) (upholding against challenge legislative veto process incorporated in review of Executive Branch leases that require continuing budget appropriations). That said, based on the form of legislative veto, enacted through legislation and examined under the then-current iteration of the Constitution, the Court determined in General Assembly that the legislative veto aggregated excessive law-making power to the Legislature and contravened the requirements of the Presentment Clause. 90 N.J. at 395-96, 448 A.2d 438.
On the very day that this Court's decision in General Assembly issued, the Legislature acted to secure for itself a constitutional form of the legislative veto. See Kimmelman v. Burgio, 204 N.J. Super. 44, 48, 497 A.2d 890 (App. Div. 1985). Thirty Senators sponsored Senate Concurrent Resolution 133 (1982), seeking to amend the New Jersey Constitution by adding a new Article V, Section 4, Paragraph 6 to establish procedures for filing and publication of administrative rules and regulations. Both houses of the Legislature ultimately passed a concurrent resolution that proposed as a constitutional amendment that the Legislature could "invalidate any rule or regulation, in whole or part, and may prohibit any proposed rule or regulation, in whole or part, by a **538 majority of the authorized membership of each House." Ibid. The resolution included the form of the question to be presented to voters on the ballot, as well as the interpretive statement to accompany the question for the voters. Ibid.
In Burgio, the Attorney General appealed to the Appellate Division seeking an injunction striking from the ballot the above-described proposed constitutional amendment. Id. at 47, 497 A.2d 890. The respondent, Secretary of State Jane Burgio, took the position that, although the proposed constitutional amendment had "several ambiguities and is susceptible to competing interpretations," the proposed amendment would be included on the ballot unless the courts instructed otherwise. Id. at 50, 497 A.2d 890. The Attorney General contended that the language of the amendment, as well as its proposed placement[2] within the Constitution, "is so ambiguous and subject to conflicting interpretations" that it should not be included on the ballot. Id. at 50-51, 497 A.2d 890. Further, even if the amendment itself was not determined to be misleading, the Attorney General argued that the interpretive statement was misleading to the voters, taking issue with, among other things, the fact that the statement did not refer to General Assembly and did not explain the substantial change that the amendment would effectuate for the workings of State government. Ibid. In sum, the Attorney General took the position that "because *676 the intent of the Legislature in submitting the amendment is so unclear the only solution" was to strike the proposed amendment from the ballot. Id. at 51, 497 A.2d 890.
The Appellate Division rejected the latter argument by the Attorney General and, from the timing of the legislative reaction inferred that the resolutions' drafters "had an intent to vest in the Legislature a power denied it under General Assembly" and "indicat[ed] an intent to grant new powers to the Legislature."
**539 Id. at 53, 497 A.2d 890. Although it declined to enjoin the proposed amendment from the ballot, the panel noted that it was not passing on the substantive validity of the proposed amendment. Id. at 55, 497 A.2d 890.
With respect to the interpretative statement, however, the panel agreed with the Attorney General that it was misleading and thus invalid. Id. at 54, 497 A.2d 890. The panel explained that
[t]he difficulty with the statement is that while it appears to indicate the amendment involves only a routine housekeeping matter, somehow furthering a power the Legislature already has, its real purpose is an attempt to limit the application of the separation of powers and presentment clauses of the constitution, fundamental clauses of great importance. Thus the amendment may reasonably [be] said to be intended to alter the basic relationship between the executive and legislative branches of government. While the voters may be privileged to this, the Legislature must take reasonable steps to insure that the voters recognize what they have been asked to do.
[ Ibid. (citation omitted).]
The statement's use was enjoined, and the matter was remanded to the Legislature for preparation of an alternative statement. Id. at 55, 497 A.2d 890. The panel suggested, but did not mandate, an alternative form of the statement. Id. at 54-55, 497 A.2d 890.
When finally placed before the voters in the 1985 general election, the proposed constitutional amendment failed to achieve a majority of the votes cast. However, another constitutional amendment was proposed and placed before the voters in 1992. The 1992 version presented a more refined version of the legislative veto power to be entrusted to the Legislature. That achieved passage by the voters.
The successful proposal differed from the previous one presented to the voters both in its procedural and substantive respects. Rather than allowing the Legislature to invalidate or prohibit any rule or regulation by a simple majority vote in each house of the Legislature, as contemplated by the 1985 proposed amendment, the constitutional amendment that passed in 1992 set forth a series of steps the Legislature must take prior to invalidating a rule promulgated by the Executive Branch. See N.J. Const. art. V, § 4, ¶ 6 (permitting invalidation only if rule is deemed inconsistent **540 with legislative intent and only after agency's opportunity to amend or withdraw rule).
The process, as described in detail in the opinion of the Court, ante at 494-96, 191 A.3d at 649-50, requires the Legislature to first determine whether the rule or regulation is consistent with the legislative intent of the implementing statute as expressed in the statute. A statement explaining the Legislature's concern about the rule is required and a hearing must be conducted. The Executive Branch then has the opportunity to review, amend, or withdraw the rule or regulation, consistent with the Legislature's determination of its intent as expressed in the legislative language, and only if not corrected or withdrawn may the *677 Legislature invalidate the rule by exercise of its veto authority.
II.
A.
The constitutional amendment adding the Legislative Review Clause does not specify a role for the Judiciary. Neither does it insulate disputes over exercises of the Legislature's veto power from judicial review. That amendment stands in contrast to other constitutional provisions that effectively preclude judicial review. Compare N.J. Const. art. V, § 4, ¶ 6 (silent regarding judicial review), with N.J. Const. art. I, ¶ 2 (b) (providing that review of sufficiency of statement of reasons for recall of elected official "shall be a political rather than a judicial question"), and N.J. Const. art. VIII, § 2, ¶ 5 (b) (declaring determinations of Council on Local Mandates to be political and not judicial determinations).
As among the parties to this action, as well as the courts to have reviewed it, there is no disagreement that the Judiciary's authority to review legislative exercises of the constitutional veto power includes, at minimum, the ability to examine for procedural compliance. The Appellate Division held that the bases for judicial invalidation of a legislative veto allow courts to
**541 reverse the Legislature's invalidation of an administrative executive rule or regulation if (1) the Legislature has not complied with the procedural requirements of the Legislative Review Clause; (2) its action violates the protections afforded by the Federal or New Jersey Constitution; or (3) the Legislature's concurrent resolution amounts to a patently erroneous interpretation of the language of the statute which the rule or regulation is intended to implement.
[ Commc'ns Workers of Am. v. Civil Serv. Comm'n, 447 N.J. Super. 584, 601, 149 A.3d 844 (2016) (internal quotation marks omitted).]
The majority who agree on the standard set forth in the Court's opinion primarily accept the Appellate Division's recitation of the standard, ante at 494, 191 A.3d at 649, but disagree with the level of deference accorded the Legislature when implementing the last prong of the standard. They state the test differently, asking whether "the Legislature has incorrectly asserted that the challenged rule or regulation is inconsistent with 'the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement.' " Ante at 517, 191 A.3d at 663 (quoting N.J. Const. art. V, § 4, ¶ 6 ).
In my view, besides finding the Court-adopted standard to state a mere conclusion rather than a test to administer, I also believe that the Court-adopted standard fails to accord to the Legislature proper deference in the exercise of its new constitutional authority. That the Court does so out of separation of powers concerns is, to me, misplaced.
B.
1.
Separation of powers concerns -- as between the Legislature and the Executive -- are absent here. "The constitutional spirit inherent in the separation of governmental powers contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch." Knight v. Margate, 86 N.J. 374, 388, 431 A.2d 833 (1981). The exercise of the Constitution's Legislative Review Clause does not usurp executive authority because the Clause has become a part of the organic *678 document governing the functioning **542 of our government. It changed the framework in which the two Branches operate with respect to delegated rulemaking authority.
The people, in unambiguous language, have granted to the Legislature a new and augmented constitutional power to invalidate administrative rules and regulations when determined, by the Legislature, to contravene legislative intent as expressed in the language of an enabling statute. We must take the language of the Constitution "as we find it," and the job of the Judiciary is to enforce it. Winberry v. Salisbury, 5 N.J. 240, 244, 74 A.2d 406 (1950).
Under the Constitution as now amended, the Legislature is authorized to explain its intent, using its language, and thereby explicate the legislative policy and principle of an enabling act for the benefit of the implementing agency. When a Branch of government exercises a power granted to it under the Constitution, substantial deference is generally given to that Branch in its exercise of that conferred power. In this dispute between an Executive Branch agency and the Legislature's use of its veto power to invalidate the agency's rule, the agency certainly does not enjoy the liberal construction of the underlying statute that it enjoys when a third party challenges an administrative rule as unauthorized by statute. Cf. N.J. Guild of Hearing Aid Dispensers, 75 N.J. at 562, 384 A.2d 795.
Yet, here, the agency is insisting on its own view of its authority to promulgate an implementing rule. But, the constitutional amendment did not grant a corollary power to the Executive Branch to interpret its enabling statute in contrary fashion to that of the Legislature. The Legislature is the Branch responsible for the delegation of rulemaking authority to the administrative agency in the first instance, and an administrative agency, as a creature of statute, has rulemaking power when the Legislature delegates it. See, e.g., Worthington v. Fauver, 88 N.J. 183, 208, 440 A.2d 1128 (1982). In this clash over legislative intent, when viewed through the prism of the constitutional amendment, the Executive Branch agency is not on equal footing. The agency's **543 rulemaking power, and any incidental ability to fill in details on policy through rulemaking, is merely derived from the Legislature's enabling act.
This challenge by an Executive Branch agency to the Legislature's use of its veto power should not rise and fall on the legitimacy of the agency's view of what constitutes a valid execution of the law. This appeal concerns whether the Legislature properly exercised its constitutional veto authority to redirect the Executive Branch concerning the import of its statutory language and what that language indicates about the Legislature's intent for the statute's policy. Although the constitutional amendment does not empower the Legislature to make new positive law, the Legislature has had its power augmented. It has now new means to redirect an Executive Branch agency about the meaning of its statutory language, and what that language intended to authorize the agency to do when, through the promulgation of rules, the agency purports to implement the intended policy of the statute.
In sum, separation of powers concerns fall away here and do not provide a sound basis to impose a judicial review standard that is not deferential to a determination of the Legislature about its intent expressed through its own statutory language. The legislative veto is a means of communication between the Executive and Legislative Branches and not an incursion on exclusive powers reposed in the Executive Branch. Presentment Clause concerns are also utterly absent. This appeal does *679 not require the harmonizing of competing constitutional provisions.
2.
The constitutional amendment says nothing about any standard by which the Judiciary should review and determine whether the Legislature's statement about its intent, as expressed in legislative language, is "correct." Ante at 516-17, 191 A.3d at 662-63. I find it difficult to believe that the effort that the Legislature went through to achieve this augmented constitutional power was to culminate in having only the ability to make a declaration, which **544 the Judiciary must determine to be worthy of affirmance as a "correct" interpretation of the Legislature's own language, using the courts' usual tools of statutory construction.
Indeed, in Burgio, the Appellate Division invalidated an interpretative statement from appearing on the ballot specifically because the proposed explanation of the amendment did not adequately inform voters of the significant alteration that inclusion of a legislative veto would have in the interplay between the Legislature and the Executive concerning regulations that transgressed statutory intent. 204 N.J. Super. at 54, 497 A.2d 890. Now that the amendment has passed, the Judiciary's duty is to enforce the provision as we find it. Winberry, 5 N.J. at 244, 74 A.2d 406. The amendment changed the interaction between the Legislature and the Executive. It empowers the Legislature to tell an Executive Branch agency that a rule is inconsistent with legislative intent as expressed through an enabling act and authorizes the Legislature to invalidate the rule if the agency does not withdraw or correct it.
Also, as noted previously, the amendment does not signal that the Executive Branch's view would be entitled to equal weight when the Judiciary is called on to umpire a statutory intent battle between the Executive and the Legislative Branches. As between a constitutional power granted by the people, through our State government's organic document, to the Legislature, and an executive rulemaking power granted, if at all, by virtue of legislative action, there can be no equipoise.
The Court adopts a standard of review that, in my view, aggregates to the Judiciary more power than should be authorized by the intent and spirit of the constitutional amendment. We are not being called on to adjudicate a third party's challenge to an agency rule. We are passing on the Legislature's use of its constitutional power to invalidate a rule. The Judiciary's view of legislative intent, culled from statutory language using the usual tools of statutory construction, is as subordinate as that of the Executive's in this setting.
**545 I respectfully suggest that a substantial deference standard of review is more consistent with constitutional text that explicitly provides the Legislature with veto power. Our job is not to determine whether the constitutional amendment is a wise or welcome addition to the interplay between Branches of Government. Our job is to enforce it. The application of substantial deference to a determination is a well-known and easily replicable standard that allows for the possibility that reasonable minds may differ, but that is not enough to invalidate a decision to which deference is owed. Several courts have explained the concept of substantial deference in other contexts. See, e.g., White v. Wheeler, 577 U.S. ----, 136 S.Ct. 456, 462, 193 L.Ed.2d 384 (2015) (discussing "substantial deference" and noting that "simple disagreement does not overcome" when deference is due); Turner Broad. Sys. v. FCC, 520 U.S. 180, 195-96, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (applying "substantial *680 deference" standard); Roe v. Kervick, 42 N.J. 191, 229, 199 A.2d 834 (1964) (discussing cases that apply "principle of judicial deference" and recognizing that deference is not overcome when reasonable minds might differ).
The test that I would apply in a challenge to the Legislature's use of the legislative veto power to invalidate an agency rule can be summarized as follows. When (1) the Legislature's veto process complies with the Legislative Review Clause's procedural requirements; (2) the Legislature provides a reasonable interpretation of statutory language to support its determination that an administrative agency's rule is inconsistent with the legislative intent expressed through that language; and (3) the veto does not work a violation of another provision of the State Constitution or one of the Federal Constitution, the legislative veto should be upheld. Even if reasonable people could differ, the Legislature's explanation of its intent, rooted in the statutory language, must prevail under a substantial deference standard. Under that approach, which I favor, the Legislature's explanation of its statutory intent, using the language of the statute, will survive challenge in the **546 courts, even if the Executive Branch agency provides an equally reasonable interpretation.
III.
To conclude, I find the standard adopted by the Court not suitable for the Judiciary to employ in the setting of a challenge to the Legislature's exercise of its constitutional veto power. To the extent that standard is now adopted for application in this and future appeals of this nature, I dissent from the holding of the Court on that issue.
Applying the deferential standard that I believe appropriate, the legislative veto at issue must be sustained. The Appellate Division judgment, which I would affirm, reached the same conclusion applying a deferential standard. To the extent that the Court's opinion upholds the veto action of the Legislature, I concur in the judgment.

On June 20, 2013, the concurrent resolution was introduced in the General Assembly as ACR-199. On June 24, 2013, the Senate passed an identical resolution, SCR-158. On June 27, 2013, the Senate substituted ACR-199 for SCR-158.

The veterans' preference is a statutory requirement that "disabled veterans who receive passing scores on open competitive examinations shall be placed at the top of the employment list in the order of their respective final scores," N.J.S.A. 11A:5-4, and that non-disabled veterans with passing scores "be placed ... immediately after disabled veterans," N.J.S.A. 11A:5-5.

On December 12, 2013, the concurrent resolution, ACR-215, was introduced in the General Assembly. The General Assembly passed that resolution on January 6, 2014. On January 9, 2014, the Senate substituted ACR-215 for SCR-166.

On May 12, 2014, that concurrent resolution, SCR-116, was introduced in the Senate. On May 22, 2014, an identical resolution, ACR-155, was introduced in the General Assembly. On June 12, 2014, the Senate passed SCR-116. On June 16, 2014, the General Assembly substituted SCR-116 for ACR-155.

On October 9, 2014, the General Assembly held a public hearing on ACR-192. On the same day, the Senate introduced its identical resolution, SCR-147. One week later, the transcripts of the public hearing were delivered to legislators' desks. ACR-192 was passed by the General Assembly on November 13, 2014. The Senate substituted ACR-192 for SCR-147 on December 18, 2014.

The CWA filed three appeals. See Commc'ns Workers of Am. v. Civil Serv. Comm'n, No. A-4912-13T3 (challenging Commission's adoption of First Amended Proposed Rule as N.J.A.C. 4A:3-3.2A ); Commc'ns Workers of Am. v. Civil Serv. Comm'n, No. A-3041-14T3 (challenging Commission's February 9, 2015 determination that N.J.A.C. 4A:3-3.2A conformed to Article VII, Section 1, Paragraph 2, and Civil Service Act); In re Job Banding for Software Dev. Specialist 1 and 2, and Network Adm'r 1 and 2, Office of Info. Tech., No. A-230-15T3 (challenging Commission's final agency decision approving Office of Information Technology's request to band titles pursuant to N.J.A.C. 4A:3-3.2A ). The CWA later withdrew its first appeal as moot. The IFTPE challenged the Commission's final agency decision approving the Department of Transportation's request to band titles pursuant to N.J.A.C. 4A:3-3.2A. In re Changes in the State Classification Plan and Job Banding Request, Dept. of Transp., No. A-232-15T3. The Senate President and the Speaker of the General Assembly filed the final two appeals. See In re Changes of State Classification Plan and Job Banding Request, Dep't of Transp., No. A-274-15T3 (challenging Commission's final agency decision approving Department of Transportation's request to band titles pursuant to N.J.A.C. 4A:3-3.2A ); In re Job Banding for Software Dev. Specialist 1 and 2, and Network Adm'r 1 and 2, Office of Info. Tech., No. A-275-15T3 (challenging Commission's final agency decision approving Office of Information Technology's request to band titles pursuant to N.J.A.C. 4A:3-3.2A ).

After the Commission moved before the Appellate Division panel for a stay of the Appellate Division's judgment pending this Court's determination, the Commission, the CWA, and the Legislature consented to a stay of the Appellate Division's judgment as applied to the 105 employees represented by the CWA who had received "advancement appointments" under N.J.A.C. 4A:3-3.2A. The Appellate Division panel denied the Commission's motion for a stay of the panel's judgment. This Court denied the Commission's motion for a stay of that judgment beyond the parameters of the consent stay and denied the Commission's motion to accelerate the appeals.

In Enourato, decided the same day as General Assembly, the Court identified a legislative veto provision that did not run afoul of the Constitution. 90 N.J. at 407, 448 A.2d 449. The statutory provision in dispute in Enourato permitted either house of the Legislature to veto building projects and lease agreements proposed by the New Jersey Building Authority. Id. at 399, 448 A.2d 449. The Court acknowledged that, taken to the extreme, "repeated legislative vetoes" could "effectively repeal" the enabling statute without presentment to the Governor. Id. at 407, 448 A.2d 449. However, it deemed that "[t]he potential ... to effectively alter the policy of existing laws without presentment" to be "negligible under the limited veto power in the Building Authority Act." Ibid.

In accordance with an Appellate Division panel's suggestion, Kimmelman, 204 N.J. Super. at 55, 497 A.2d 890, the proposed amendment's interpretive statement cautioned voters that the amendment "would constitute a fundamental change in the relationship between the co-equal branches of government." Public Question No. 7 (1985), http://www.njelections.org/election-results/1985-public-questions.pdf.

Four of our sister states have constitutional provisions providing for legislative oversight of administrative regulations. Conn. Const., Amends. art. XVIII; Idaho Const. art. III, § 29 ; Iowa Const. art. III, § 40 ; Nev. Const. art. 3, § 1. No appellate court in any of those jurisdictions, however, has addressed the standard of review that governs a legislative veto of a rule or regulation. In a decision applying the Iowa constitutional provision, the Iowa Supreme Court addressed a different separation-of-powers question. It rejected the executive agency's contention that only the Legislature, not the court, could review agency regulations; because the Legislature had not invoked its power to invalidate the regulation, the court reviewed that regulation with deference to the agency. Iowa Fed'n of Labor v. Iowa Dep't of Job Serv., 427 N.W.2d 443, 445-49 (Iowa 1988).

Nothing in the Legislative Review Clause authorizes the Legislature to prospectively invalidate all future amendments to N.J.A.C. 4A:3-3.2A ; indeed, the Clause envisions that an agency may amend a rule or regulation in order to align it with the enabling statute. N.J. Const. art. V, § 4, ¶ 6. Although the Legislature resolved that any future amendments to N.J.A.C. 4A:3-3.2A would be declared null and void in ACR-192, there were no such amendments, and that declaration had no impact on the outcome of these appeals.

In 1993, the Legislature amended the Civil Service Act to bar the transfer of any title "from the State unclassified service or the senior executive service" to the noncompetitive division of the career service, and to bar the transfer or appointment of any "individual serving in a title of the State unclassified service or the senior executive service" to the noncompetitive division of the career service," in the last six months of a governor's term. N.J.S.A. 11A:3-2.2.

Regulations other than N.J.A.C. 4A:3-3.2A also authorize waivers of competitive examinations. See N.J.A.C. 4A:4-2.14 (authorizing waiver of examination for persons with disabilities); N.J.A.C. 4A:4-2.7 (authorizing Commission to waive examination for promotion if "[t]he employee has been successfully tested in the basic skills required for the promotional title"; "[t]he employee has not failed, within one year prior to the announced closing date, a promotional examination for that title"; "[t]he number of interested eligibles for the promotional examination does not exceed the number of promotional appointments by more than two"; and "[v]eterans preference rights are not a factor").

The Commission's reliance on its promulgation and enforcement of N.J.A.C. 4A:3-3.7 to implement job banding in trainee positions, which prompted no legislative veto pursuant to N.J. Const. art. V, § 4, ¶ 6, is misplaced. That regulation, governing only "entry level employment," requires a trainee to complete a training period before appointment to a "primary title," N.J.A.C. 4A:3-3.7(a), (c), (j). As the Commission stated in a final administrative action reallocating various trainee titles to the noncompetitive division of the career service, "competitive testing [for those trainee titles] is not practicable since the knowledge, skills, and abilities associated with a trainee title are evaluated during the mandatory training period." In the Matter of Reallocation of Local Trainee Titles from the Competitive to the Non-Competitive Division of the Career Service, CSC Docket No. 2015-2987, final administrative action, (May 8, 2015), 2 http://www.state.nj.us/csc/about/meetings/decisions/pdf/2015/5-6-15/B-74.PDF. The "trainee" titles are clearly within the category of positions that "cannot be properly tested for, such as lower-level jobs which do not require significant education or experience," for which the noncompetitive division exists. N.J.S.A. 11A:3-2.1(d).

In light of the Commission's amendments to the job banding proposal, the Legislature did not rely on N.J.S.A. 11A:5-7, the provision addressing the veteran's preference in promotions, in the concurrent resolutions under review. See S. Con. Res. 116; A. Con. Res. 192. That statute is thus not relevant to our analysis.

For example, when the Office of Information Technology (OIT) implemented job banding, it established the following competency standards to be considered: (1) Performance Assessment Review (PAR) -- twenty percent; (2) structured interview during which a panel no fewer than three interviewers will rate all candidates based on their responses to a set of predetermined questions designed to illicit responses that demonstrate each employee's competencies in areas relevant to the position -- forty percent; (3) written exercise (where practicable) to include preparing a sample program, solving a scenario-driven network problem, etc., with each question to be graded anonymously using rubric -- twenty percent; and (4) a work history review -- twenty percent.

The Attorney General maintained that because the amendment was not proposed to be placed either in the Separation of Powers or Presentment Clauses of the Constitution, the amendment was merely confirmatory. This argument was used to bolster the ambiguity argument advanced by the Attorney General.